**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRISTA C.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 C 4921** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, 1381a, 1382c, over three years ago in June of 2018. (Administrative Record (R.) 213-25). She claimed that she has been disabled since January 1, 2017, due to spondylitis, sacroiliitis, rheumatoid arthritis, bursitis, scoliosis, cretonne, degenerative disc disease, autoimmune disease, high blood pressure, and anxiety. (R. 238). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on August 21, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on October 7, 2020. [Dkt. #7]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

# I.

## A.

Plaintiff was born on February 25, 1987, making her just 29 years old when she claimed she became unable to work. (R. 213). She only made it through the tenth grade in school. (R. 40). She worked "on and off" as a waitress from the time she was 18 years old, steadily from 2012 through 2017, and part-time the last couple of years. (R. 39. 231, 254-57). At just 5'5" tall, she weighed 260 pounds. She testified that she had lost 50 pounds to get to that weight, but was disappointed that it had not helped her back pain. (R. 39-40). She used a back brace, a cane, a grabber to pick up things and get dressed, and a rail in the shower. (R. 40).

Plaintiff said she was unable to drive because her feet get numb. (R. 41). She lived with her daughter and a roommate. Her daughter and roommate did most of the housework, but plaintiff did the laundry. (R. 44). She estimated that she had undergone 40 epidural steroid injections over the years. (R. 41). They were hit and miss. Improvement was about 30-40% to where she could walk for five days to a few weeks. (R. 53).

She last drove a year and a half before the hearing; now her feet got numb so she was no longer able to. (R. 42). Five days out of every week, she said couldn't get out of bed. (R. 45). During the day on a typical day, she would be lying down only 2 or 3 hours. (R. 51-52). The rest of the time she would be sitting or standing. (R. 51). She could sit for 5 minutes, stand for 15 minutes, and walk about a block with breaks along the way. (R. 47). She and her daughter got by on food stamps and plaintiff's friend letting them live at her place. (R. 55).

The record in this case is large and messy. The medical evidence covers about 1350 pages (R. 319-1674) and, as is the custom, comes to court compiled in haphazard fashion. Medical files

jump from 2011-2013 to 2017-2017 to 2017-2018 to 2016-2018 throughout the record. A fair portion of those records are duplicates and triplicates. Neither party was able to make much sense of it in their briefs, citing perhaps a couple dozen pages of it or so. What it distills down to is that plaintiff does have a handful of impairments that give her a fair amount of pain in her back and legs, for which she has consistently sought treatment, mostly without success, for several years.

The plaintiff has a history of experiencing pain due to her two major ailments: rheumatoid arthritis with ankylosing spondylosis and degenerative disc disease with disc bulging in her lumbar spine. Doctors haven't been much help, and as her pain has continued, they have prescribed her a pharmacy's worth of NSAIDs, muscle relaxers, and pain medications: acetaminophen, cyclobenzaprine, diazepam, gabapentin, hydrocodone, ibuprofen, meloxicam, tizanidine, celebrex, dilaudid. (R. 631-32, 641, 653, 679). And, they have given her repeated, almost regular, epidural steroid injections; perhaps not 40 as plaintiff estimates, but if she is wrong, the record shows she is not far wrong. Her treatment has been further complicated by the fact that she is allergic to many of the medicines that would be prescribed for her rheumatoid arthritis: Enbrel, Humira, methotrexat, Simponi. (R. 575, 606, 631, 668).

Plaintiff's troubles appear to have begun in earnest back in 2015 when she was still working as a waitress. She lost her rheumatologist due to insurance issues. (R. 947). So, upon a significant flare-up, she had to go to the emergency room in tears with acute low back pain on December 26, 2015. (R. 946). She was given diazepam and was able to walk upon discharge. (R. 947). She continued trying to work through 2016, but pain continued as well. (R. 953, 958). Surgery was not an option at that point. (R. 955).

3

On September 10, 2017, CT scan of the cervical, thoracic, and lumbar spines was normal. (R. 571-72, 576). Sensory and motor exam was normal. There was tenderness to palpation all throughout the spine, however. (R. 576, 584). MRI on September 14, 2017, demonstrated degenerative disc disease with diffuse disc bulging, mild central canal stenosis, and spondylosis. (R. 601, 608-09). Neurological and musculoskeletal exams revealed tenderness and limited range of motion in the lumbar spine (R. 602, 607, 612).

Plaintiff saw her treating physician, Dr. Byjak, on September 19, 2017. He noted that an MRI showed a bulging disc. Pain was improved by only 20%; standing was difficult. The doctor said plaintiff could not work for 3 weeks. There was tenderness and limited range of motion in the lumbar spine. (R. 692). On October 12, 2017, Dr. Byjak reported that an MRI showed some disease of the spine. There was tenderness along the spine and in the sacroiliac joints. Gait was normal and there were no motor or sensory deficits. (R. 689-90).

On December 12, 2017, plaintiff sought treatment for a significant increase in pain which caused her to fall trying to walk. She was treated in the ER with morphine, valium, tylenol, and motrin. (R. 1019). Strength and sensory exams were normal the next day, but there was tenderness in the spine and in the SI joints. (R. 1020). A week later she had a bilateral SI joint injection. (R.1026). Plaintiff underwent a bilateral SI joint injection on December 21, 2017. (R. 644).

By January 8-9, 2018, plaintiff reported this was 100% effective for her back pain, but that she still had left hip and leg pain. (R. 655). Again, range of motion throughout the spine was limited. Strength was normal throughout, but reflexes were significantly reduced. Sacral sulcus tenderness, bursa tenderness, and facet loading were all positive. Again, a number of tests were not performed due to plaintiff's significant pain, including straight leg raising. (R. 657). A week later, plaintiff was

4

again seeking treatment for left hip pain which had become progressively worse. (R. 667). It was exacerbated by walking, standing, bending and prolonged sitting. (R. 667). Physical exam was unchanged. (R. 669-70). Pain continued and exam was unchanged again a couple of weeks later. (R. 678). Medications were adjusted, with celebrex added and dilaudid replacing (R. 679).

On February 28, 2018, plaintiff was again seeking treatment for left hip pain radiating down to her foot and low back pain. Little or nothing had changed. Norco replaced dilaudid and another injection was scheduled. (R. 745-48). Plaintiff was back again on March 28, 2018. She reported 30% relief from the injection. (R. 772). In April, plaintiff's condition was unchanged, but she tested positive for THC and was told if she did again, her pain medications would be discontinued. (R. 787-88). Another injection was scheduled (R. 787, 841, 1047). That injection provided only minimal relief. (R. 850-51).

Plaintiff saw Dr. Byjak again on April 26, 2018. He reported abnormal gait, tenderness in the spine, and swelling in both knees. (R. 686). The doctor felt plaintiff would need to see a rheumatologist for her rheumatoid arthritis and ankylosing spondylitis. He thought further injections might be helpful. (R. 687). Another one was given on May 9, 2018. (R. 1055).

Plaintiff reported continued and increased pain on May 30, 2018. (R. 850-51). Examination was the same as the previous examinations: limited range of motion, reduced reflexes, normal strength, and several tests not performed due to pain. (R. 853). Plaintiff had yet another injection on June 14, 201 8. (R. 1059). But, more injections were in the offing for the plaintiff in July and again in October 2018. (R. 854, 1465, 1493,1507). Relief ranged from none to 30% to 50% to 100%. (R. 1480). Pain continued through 2018. Exams in August, September, October showed limited range of motion, reduced reflexes, normal strength, positive tenderness testing, pain

5

preventing a number of other tests.   (R. 1476, 1478-80, 1489, 1491-92, 1523-24).

Report of an EMG done on November 21, 2018, was illegible as included in the record.  (R. 1540-42).  As a result, the ALJ presumed it had never been done, despite the fact that it as mentioned in a doctor's report from March 1, 2019.  (R. 1552).  The results were actually interpreted as an "abnormal study" with "evidence of mild chronic low lumbar radiculopathy . . . most notable at L4/L5." [Dkt. #19-1].

Plaintiff also developed right foot pain toward the end of 2018.  X-rays on November 1, 2018, revealed a small plantar calcaneal spur on her right foot.  (R. 1646-47).  An x-ray in February 2019 revealed degenerative disc disease in plaintiff's thoracic spine.  (R. 1654-55).

On March 1, 2019, plaintiff was seeking treatment for continued back pain and radiating symptoms again.  She was noted to be walking with a limp.  Range of motion in the spine was limited.  Strength was normal, but reflexes were reduced and sacral sulcus tenderness, bursa tenderness, and facet loading were all positive.  Straight leg raising was finally done and was positive for radiculopathy in the left leg. (R. 1551). Plaintiff was given yet another epidural steroid injection on March 5, 2019.   (R. 1562-63).  Plaintiff was still limping at examination on March 29, 2019. Examination was the same as it had been on March 1st, with limited range of motion and positive straight leg raising.  (R. 1574).  Examination was again the same on April 29, 2019.  (R. 1588).

In May 2019, it was time for another epidural steroid injection.  (R. 1599).   This one provided 50% pain relief for about a week.  (R. 1609).  Examination on May 30, 2019, was much the same; plaintiff continued to walk with a limp. (R. 1611).  She was given another injection in August.  (R. 1636).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "ankylosing spondylitis; lumbar radiculopathy; sacroiliac joint dysfunction; trochanteric bursitis; rheumatoid arthritis; and obesity". (R. 17). The ALJ found that, while plaintiff had a number of other impairments, including substance abuse, hypertension, and anxiety, they were not severe. (R. 18). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on Listing 1.02 (covering dysfunction of a joint), 1.04 (covering disorders of the spine), and 14.09(covering inflammatory arthritis). (R. 19-20).

The ALJ then determined that plaintiff could perform light work with the following limitations: she could never climb ladders, ropes, or scaffolds; she could occasionally stoop and crouch; she could frequently climb ramps and stairs, balance, kneel, and crawl; and she could never work at unprotected heights or around moving mechanical parts. (R. 20). The ALJ then summarized the plaintiff's allegations and concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 21). The ALJ then summarized the plaintiff's treatment and medical evidence, noting that the plaintiff's treatment had been conservative – medication and injections – and that she hadn't always followed through with medical recommendations. (R. 21-24). The ALJ also

7

determined that she made inconsistent statements to healthcare providers. (R. 24).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could perform her past relevant work as a waitress (DOT #311.477-030, SVP 3, light exertion as generally performed and medium as plaintiff performed it). (R. 25). The ALJ, again relying on the testimony of the vocational expert, also found that there were other jobs that existed in significant numbers in the national economy that plaintiff could perform: Mail Clerk, DOT 209.687-026, an unskilled job (SVP 2), classified at the light exertion level per the DOT, and 10,500 jobs in the national economy; Cleaner, DOT code 323.687-014, an unskilled job (SVP 2), classified at the light exertion level per the DOT, and 532,000 jobs in the national economy; Cashier, DOT code 211.462-010, an unskilled job (SVP 2), classified at the light exertion level per the DOT, and 880,000 jobs in the national economy. (R. 26-27). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 27-28).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to

whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). *Accord Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek* , 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Of course, this is somewhat of a subjective standard: one reader's Mackinac Bridge is another's swaying rope. The inherent elusiveness of the requirements makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged. But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ

9

considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985); *Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). This, is at least how things stood until the Order by Judges Sykes, Easterbrook and Scudder in *Brumaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021) – which seemed to cast doubt on the "logical bridge" requirement – at least as many had understood it. There, the plaintiff argued that the ALJ failed to build a "logical bridge" from the evidence to his determination that the plaintiff was capable of light work. The plaintiff contended that the ALJ should have *explained* what changed after the first ALJ's conclusion that she could only do sedentary work, and since she did not, the "logical bridge" requirement had not been satisfied – and reversal was therefore mandatory. The Court of Appeals, citing *Biestek's*, 139 S.Ct. 1152 substantial evidence requirement, unhesitatingly rejected this contention, saying: "[t]his argument rests on a *faulty premise*: the 'logical bridge' language in our caselaw *is descriptive but does not alter the applicable substantial-evidence standard*." 850 F.App'x at 977 (Emphasis supplied).[2] Apart from the fact that an Order is an unorthodox device for casting doubt in a long-adhered to doctrine, five months after *Brumbaugh*, the court in *Wright v. Kijakazi*, _Fed.Appx._, 2021 WL 3832347 (7th Cir. 2021) cited the "logical bridge" language with seeming and unqualified approval. In any event, given the medical evidence and the work the ALJ found the plaintiff could do, a sketchy opinion is not enough here. And reversal is required even under a rigid interpretation of the logical bridge requirement.

---

[2] Since the ALJ's decision was supported by substantial evidence, the Court of Appeals affirmed.

### III.

### A.

As it happens, this case has a "logical bridge" problem.  It is often said that courts must apply a common-sense approach to reviewing an ALJ's decision. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  Common sense undercuts the ALJ's decision here.  The record demonstrates that plaintiff suffers from rheumatoid arthritis and degenerative disc disease in her lumbar and thoracic spine.  She has radiating pain down her left leg, which has been confirmed by straight leg raising tests – when those tests have not been precluded by pain – and an EMG.  She also developed a spur in her right heel.  All that is enough give one pause when an ALJ decides a person can be on her feet all day, every day, carrying trays of food back and forth as a waitress.  Then add the fact that plaintiff is morbidly obese, with a BMI ranging from 43 to 49.  A person with a BMI of 30 is deemed obese, and a person with a BMI of 40 is deemed extremely obese.  "Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity," Social Security Ruling 02–1p.  To paraphrase the Seventh Circuit from a case in which the plaintiff had far fewer impairments and was carrying far less weight, "[i]t is one thing to have a bad [back, left leg, and right foot]; it is another thing to have a bad [back, left leg, and right foot] supporting a body mass index in excess of 40." *Martinez v. Astrue*, 630 F.3d 693, 698–99 (7th Cir. 2011); *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)("Additionally, . . . the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic.").  From a common-sense perspective – or a "logical bridge" perspective – the ALJ's decision just doesn't add up.

11

An ALJ must account for the combined effects of all of a plaintiff's impairments, including those that are not themselves severe enough to support a disability claim. *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir.2003). There is nothing in the ALJ's opinion to assure a reviewing court that he considered the effects of all of plaintiff's impairments in combination. It is certainly not clear from the statement that plaintiff's impairments have been "accommodated by requiring that she never climb ladders, ropes, or scaffolds, only occasionally stoop and crouch, frequently climb ramps and stairs, balance, kneel, and crawl, and never work at unprotected heights or around moving mechanical parts." (R. 25). How does climbing stairs up to two-thirds of every day accommodate bulging discs and radiculopathy down the left leg, a heel spur, rheumatoid arthritis and morbid obesity? It's certainly not self-evident as it might arguably be if a person were found limited to sedentary work. But what the Seventh Circuit said about the plaintiff in *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014) doing sedentary work – as opposed to waitressing – seems applicable here:

> Remember that she's almost morbidly obese. This might make it difficult for her to sit for long periods of time, as sedentary work normally requires. Presumably she could get up from her work table from time to time, but that might be painful given her obesity—the sheer weight she must lift—and her leg pain, which is aggravated by standing, since standing requires her legs to support her great weight. We don't want to play doctor ourselves; but the likely difficulties that morbidly obese persons (and the plaintiff is almost morbidly obese) face even in doing sedentary work are sufficiently obvious . . . .

*Id.* at 707. Certainly, the difficulties the plaintiff in this case would face on her feet waiting on tables for eight hours every should be sufficiently obvious.

To support plaintiff's capacity to return to her waitress job, in the main, the ALJ's analysis focused on the plaintiff's course of treatment. For the ALJ, a medication regimen of strong narcotics,

12

muscle relaxers, and anti-inflammatories, combined with dozens of epidural steroid injections was conservative treatment, meaning that things were not as bad as plaintiff alleged. This type of treatment might be termed "conservative" in the sense that it is not surgery, but nevertheless, narcotics and injections tend to support allegations of pain rather than detract from them. *See, e.g., Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (contrasting 'conservative' treatment like over-the-counter medication with 'more aggressive' treatment like prescription narcotics and steroid injections). *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.2004) (physicians' prescription of strong pain medications substantiated claimant's pain allegations). Moreover, the ALJ seemed to assume that surgery was somehow a recommended option. But it would have done nothing for plaintiff's rheumatoid arthritis and it may have been inadvisable due to her morbid obesity. Indeed, at least at one point in the record, doctors said surgery was not indicated. (R. 955). And, further treatment for plaintiff's rheumatoid arthritis was curtailed because of her allergies to many immuno-suppressant medications. (R. 575, 606, 631, 668). The ALJ did not explore any of this. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)(ALJ must explore the reasons for lack of course of treatment, such as ineffectiveness, before drawing a negative inference); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir.2008).

The ALJ also called into question plaintiff's veracity because she "made inconsistent statements to medical providers"; meaning she told her treating physician that injections had provided no relief, but told other providers that they had provided 30-50% relief. It's not clear where the ALJ got this from or what exactly to make of it. As the plaintiff testified – and as her statements to providers throughout the record support – injections were "hit and miss" in terms of

the degree of relief provided. Moreover, the records the ALJ cites do not indicate that plaintiff told her physician they never provided any relief. In fact, those records indicate plaintiff reported "moderate response" (R. 717, 727, 1673), as opposed to "not giv[ing] her any relief" as the ALJ states. (R. 24).

The ALJ also got a couple of other things wrong in dismissing the plaintiff's allegations. He said plaintiff stopped seeing her treating physician after mid-2018, insinuating, again, that things could not be as dire as plaintiff alleged. (R. 24). But, as the record shows, that's not true. Plaintiff continued to treat regularly with Dr. Byjak through 2019. (R. 1661-72). The ALJ also asserted that plaintiff failed to follow through with a scheduled EMG toward the end of 2018. (R.23). Also, not true. In fact, plaintiff did have the EMG in November 2018, which was positive for radiculopathy. (R. 1540-42). The ALJ may have missed it as the report in the disorganized administrative record is illegible, but an examination report in March 2019 mentions that EMG having been done (R. 1552), so the ALJ should not have used plaintiff's purported failure to follow through with her doctor's recommendation to attack her credibility.

Similarly, the ALJ also found plaintiff not credible because "despite the [plaintiff's] hearing testimony that she used a cane for balance and ambulation, the record is void of medical documentation establishing the need for a hand-held assistive device . . . no medical provider prescribed a cane, nor did they describe circumstances for which an assistive device was needed." (R. 23). But, no prescription is required for a cane; a cane "can be bought by anyone who wants [one]." *Stahl v. Colvin*, 632 F. App'x 853, 860 (7th Cir. 2015); *Frazier v. Berryhill*, 2019 WL 157911, at *6 (N.D. Ill. 2019). The fact that no doctor may have prescribed a cane does not mean plaintiff was lying about using it to walk and help with her balance. Doctors have repeatedly

observed her to have a limp, diminished reflexes, limited range of motion, and radiculopathy established by positive straight leg raising and, later, an EMG. With all that, it's not surprising plaintiff went out and got herself a cane, prescription or not. They are available, for example, at Walgreens without any prescription.

So, in the end, this is a case where the "logical bridge" fails at several points. The court does not know what these records look like when they are before the ALJ but, if it is similar to the unorganized jumble they look like when they finally are filed in federal court, mistakes are understandable. But where multiple mistakes form the basis for the ALJ's assessment of a plaintiff's claim, and it strains credulity that a plaintiff can return to the work the ALJ thinks she can despite multiple impairments that adversely affect her ability to be on her feet all day, every day, the case has to be remanded for a more careful look.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #20] is granted, and the defendant's motion for summary judgment [Dkt. #27] is denied.

.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/13/21

15